IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FAIR OAKS FARM, a family partnership, :
owned and operated by
Mr. and Mrs. Lee Worthington; :
GAYLORD MILLARD, d/b/a Millard Dairy,
THE PENNSYLVANIA ASSOCIATION :
OF MILK DEALERS,
    Plaintiffs :

                                        :
    vs.                                     CIVIL NO. 1:CV-10-1591
                                        :

RICHARD KRIEGEL, Chairman of the :
PA Milk Marketing Board;
LUKE BRUBAKER, and
BARBARA GRUMBINE, Members of the :
PA Milk Marketing Board;
    Defendants :

*M E M O R A N D U M*

I. *Introduction*

       The plaintiffs are Fair Oaks Farm, Gaylord Millard, d/b/a Millard Dairy, and the Pennsylvania Association of Milk Dealers (PAMD). The defendants are Richard Kriebel, Luke Brubaker and Barbara Grumbine, members of the Pennsylvania Milk Marketing Board (Board), sued in their official capacities only.

       The plaintiffs filed this suit to challenge a Board order changing the way the over-order premium payable to Pennsylvania dairy farmers for their milk is calculated.

The plaintiffs argue the order violates the Commerce Clause by discriminating against milk from outside Pennsylvania.

The order is scheduled to take effect on October 1, 2010. We are considering the plaintiffs' motion for a preliminary injunction to enjoin the defendants from enforcing the order until a trial on the merits resolves the Commerce Clause issue. Neither party has requested a hearing, and we resolve the motion based on their evidentiary submissions.

II. *Discussion*

A. *Standard for Granting a Preliminary Injunction*

"A party seeking a preliminary injunction must satisfy the traditional four-factor test: (1) a likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief." *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010).

B. *Likelihood of Success on the Merits*

The Commerce Clause, U.S. Const., Art. I, § 8, cl. 3, authorizes Congress to regulate commerce among the several states, and implicitly restrains the power of a state to regulate interstate commerce. *United Haulers Assoc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338, 127 S.Ct. 1786, 1792, 167 L.Ed.2d 655 (2007). The latter restraint is referred to as the "dormant" Commerce Clause.

> To determine whether a law violates this so-called "dormant" aspect of the Commerce Clause, we first ask whether it discriminates on its face against interstate commerce. *American Trucking Assns., Inc. v. Michigan Pub. Serv. Comm'n,* 545 U.S. 429, 433, 125 S.Ct. 2419, 162 L.Ed.2d 407 (2005); *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources*, 504 U.S. 353, 359, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992). In this context, "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); *New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 273, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988). Discriminatory laws motivated by "simple economic protectionism" are subject to a "virtually *per se* rule of invalidity," *Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), which can only be overcome by a showing that the State has no other means to advance a legitimate local purpose, *Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986).

*Id.* at 338-39, 127 S.Ct. at 1793. *See also Oregon Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 99, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994)("If a restriction on commerce is discriminatory, it is virtually *per se* invalid.").

Both federal and state law regulate milk pricing. We need not go into detail on the regulatory schemes. For our purposes, we need only note that Pennsylvania requires Pennsylvania milk dealers to pay an over-order premium to Pennsylvania milk producers for Class I milk.[1] The over-order premium is an amount added to the federal minimum price, or in those areas of Pennsylvania where there is no federal minimum

---

[1] The dealers here are also called "processors" of raw milk. (But not all dealers are processors.) Processors change milk into finished products, like Class I milk. Class I milk is fluid milk intended for drinking. Dealers sell the finished milk products to wholesalers and retailers. Producers are dairy farmers.

price, the Pennsylvania minimum price. Some states, like Maryland and Ohio, where plaintiff producers, Fair Oak Farms and Millard Dairy, are located, respectively, have no state minimum price. The price to be paid producers in those states is set by the federal minimum, plus any "market premium" set by the law of supply and demand, known in the industry as a "voluntary premium." (Doc. 23, Br. in Support, p. 4). Fair Oak Farms and Millard Dairy allege that they currently receive the federal minimum price plus a voluntary premium from Pennsylvania dealers for their Class I milk.

Under the current formula for calculating the over-order premium, out-of-state raw milk is excluded from the calculation, as the plaintiffs observe. Under the current formula, the over-order premium rate, a dollar amount per hundredweight ("cwt," or hundred pounds of milk), set monthly, is multiplied by the ratio of the quantity of raw milk purchased in Pennsylvania to the dealer's total quantity of raw milk purchased, and then multiplied by the amount of the dealer's Class I finished product sold in Pennsylvania.

The calculation is illustrated by the example the plaintiffs use: a dealer who purchases 10 million pounds of Pennsylvania raw milk, 2 million pounds of out-of-state raw milk, and sells 6 million pounds of Class I finished product in Pennsylvania, with an over-order premium rate (in this example, the rate from July 2010, $2.71 per hundredweight, or .071). Ten million pounds divided by 12 million pounds is .83333. Multiplying that figure by 6 million pounds multiplied by .071 leads to a total dollar figure of $135,500 for the dealer's over-order premium obligation to its Pennsylvania producers.

Under the newly adopted formula, in Order A-968, the over-order premium obligation is no longer calculated by using only the percentage of Pennsylvania raw milk purchases to the total of raw milk purchases. A dealer's over-order premium obligation will now be calculated by multiplying the over-order premium rate by the lesser of: (1) its Pennsylvania sales of finished Class I product; or (2) its total purchases of Pennsylvania raw milk.

Using the same example as above, the dealer's over-order premium obligation increases to $162,600, because the lesser figure is the 6 million pounds of Pennsylvania sales, but now that figure, the same figure used in the current formula, is multiplied by the full over-order premium rate, without a percentage reduction for the out-of-state raw milk.

The new formula will have no effect on the over-order premiums paid by processors who purchase all of their raw milk from Pennsylvania producers since that ratio has always been 100% and not some lesser percentage because of purchases of out-of-state milk. However, there are nine Pennsylvania processors which purchase both in-state and out-of-state milk, and eight of those have Pennsylvania purchases that exceed their sales, and by wide margins. (Doc. 26-3, Herbein Decl. ¶¶ 6-7).

Two dealers have submitted penalty-of-perjury declarations as to the effect the new formula will have on their ability to purchase out-of-state milk. Todd Rutter is the president of Rutter's Dairy, a processor in York, Pennsylvania. (Doc. 1–7, Rutter Decl. ¶¶ 1 and 3). Under the new formula, Rutter's will have to pay Pennsylvania producers an

additional monthly over-order premium in excess of $20,000.  (*Id.* ¶ 8).  Based on market conditions, Rutter's will not be able to increase its price to Pennsylvania wholesalers to make up the difference.  (*Id.* ¶ 9).  Instead, Rutter's will have to find cost savings elsewhere.  Among those places would "most likely" be eliminating its voluntary premium payments to Maryland producers.  (*Id.* ¶ 10).  Rutter's could reduce its over-order premium by reducing its purchase of Pennsylvania raw milk below its Pennsylvania sales, but it would have to replace about 2.5 million pounds before seeing any reduction, and the market for raw milk does not provide any ready replacement for that Pennsylvania milk.  (*Id.* ¶ 11).

Frank Chrastina is the general manager of Dean Sharpsville, a processor in Sharpsville, Pennsylvania, about a mile from the Ohio border.  Under the new formula, its over-order premium to Pennsylvania processors will double, an increase of $300,000 per month.  (Doc. 1-8, Chrastina Decl. ¶¶ 5 and 6).  Because of the market, Dean Sharpsville cannot pass on the increase to its wholesale buyers or retailers.  (*Id.* ¶¶ 7, 11-12).  The increase will have an effect on its voluntary premiums paid to Ohio producers (characterized by Chrastina as the imposition by the Board of "a premium obligation on our Ohio milk payable to Pennsylvania dairy farmers").  (*Id.* ¶ 13).  To reduce the effect of the new formula Chrastina has been soliciting Ohio producers, but it has been "a slow process . . . as available milk is otherwise committed."  (*Id.* ¶ 19).

Rutter's and Chrastina's statements about the unavailability of raw milk is confirmed by William Schiek, an economist for a trade association representing fluid milk

processors and dairy product manufacturers. (Doc. 1-9, Schiek Decl. CM/ECF p. 3). According to Schiek, "there is rarely a ready quantity of uncommitted, or excess, milk available within reasonable distances to supply a plant in lieu of its established local suppliers. Alternative milk supplies (dairy farmers) are usually already committed to other milk processors. In order to cultivate new supplies, it is often necessary to pay premiums to provide sufficient incentives for dairy farmers to switch from their existing milk buyer and sell their milk to a new plant." (*Id.* ¶ 2).

The two out-of-state producer plaintiffs have submitted penalty-of-perjury declarations concerning the new formula. Lee Worthington is the owner of Fair Oaks Farm in Smithsberg, Maryland. (Doc. 1-5, Worthington Decl. ¶¶ 1 and 2). Fair Oaks Farm sells all its milk to Rutter's Dairy. Rutter's currently pays about a $1.00 "Maryland premium" over the federal minimum price. Fair Oaks Farm is operating at a loss now, and if Rutter's reduces this premium, the farm would not be able to repair and maintain equipment. (*Id.* ¶ 7). It is an independent producer and would prefer not to become a member of a cooperative. (Id. ¶ 8).

Gaylord Millard owns plaintiff Millard Dairy, an Ohio farm less than five miles from the Pennsylvania border. (Doc. 1-6, Millard Decl. ¶¶ 1 and 2). Dean Sharpsville buys all of its milk. (*Id.* ¶ 4). If the farm were to lose about half its voluntary premium, about $25,000 per year, it "would likely" be put [ ] out of business," or at least not be able to repair and maintain equipment. (*Id.* ¶ 8).

7

The plaintiffs argue that the new formula violates the Commerce Clause in three ways. First, it discriminates against out-of-state producers by effectively imposing upon their milk a premium payable only to Pennsylvania producers. This is so because out-of-state milk purchases are now included in calculating the over-order premium, and the premium is paid only to Pennsylvania producers. Further, the more out-of-state milk purchased means more over-order premium dollars for the dealer's Pennsylvania producers.[2] The plaintiffs cite in support of this argument *Hillside Dairy, Inc. v. Kawamura*, 317 F. Supp. 2d 1194 (E.D. Cal. 2004), *on remand from Hillside Dairy, Inc. v. Lyons*, 539 U.S. 59, 123 S.Ct. 2142, 156 L.Ed.2d 54 (2003).

Second, it discriminates against out-of-state milk by making it cheaper to purchase Pennsylvania milk. It does this by imposing a "charge" on Pennsylvania dealers who purchase out-of-state milk because the per unit cost of Pennsylvania milk becomes more expensive as the dealer purchases out-of-state milk and conversely lowers as it purchases more Pennsylvania milk. (Doc. 1-10, Ex. H).[3] The plaintiffs argue this is effectively a "tariff" on out-of-state milk, and cite in support *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994).

Third, the new formula violates the Commerce Clause by effectively reserving the Pennsylvania Class I wholesale market for Pennsylvania producers in

---

[2] This is so because as out-of-state purchases replace Pennsylvania purchases, eventually the lesser figure to be used in the calculation is Pennsylvania sales, but the premium is spread over fewer pounds of Pennsylvania milk, meaning more premium dollars for Pennsylvania producers.

[3] The same mechanism described in note 2 is said to be at work here.

violation of *Polar Ice Cream & Creamery Co. v. Andrews*, 375 U.S. 361, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964)(Florida violated the Commerce Clause by requiring in-state dealers to purchase Class I Milk from in-state producers).  The plaintiffs reason in part that under the current formula out-of-state milk effectively has equal access to Pennsylvania but that the new formula effectively eliminates that access.[4]

In opposition, the defendants argue the new formula does not violate the Commerce Clause for two reasons.  First, the formula does not impose a "charge" or a "tariff" on out-of-state milk.  It merely represents an attempt to reallocate more fairly the money Pennsylvania dealers receive from wholesalers in the sale of milk.  Dealers receive payment of the over-order premium as part of this legally mandated wholesale price, and the new formula merely requires them to "pay to Pennsylvania producers . . . more of the over-order premium those dealers collect as part of minimum wholesale prices."  (Doc. 23, Opp'n Br. at p. 7).  According to the defendants, under the current formula Pennsylvania dealers who obtain all their milk from Pennsylvania producers "pay the full amount of the over-order premium back to the producers but "[s]ince the over-order premium is built into the wholesale and retail pricing system, . . . milk dealers are fully reimbursed." (*Id.*, p. 6).  However, it works differently for dealers who obtain some of their milk from out-of-state.  Those dealers collect the full over-order premium on their

---

[4] We think the reasoning here is that under the current formula dealers in essence use the over-order premium that the new formula assigns to Pennsylvania producers to pay their out-of-state producers so it can be said that out-of-state producers are not being discriminated against because in this way they are receiving their share of the over-order premium.

wholesale sales but do "not return[ ] that money to producers "as part of the Board-mandated minimum producer price." (*Id.*).  As noted, the new formula is an attempt to give more of the over-order premium to Pennsylvania producers.  The defendants argue that the effect of the new formula on dealers is merely to reduce their profit margins because now more of the over-order premium will be paid to producers.  They also point out that under the new formula dealers who buy out-of-state milk are now simply paying the same over-order premium as those who purchase only in-state milk.

> As part of this argument, the defendants state:
>
>    This case presents the proverbial question of whether the glass is half-empty or half-full.  Plaintiffs fail to recognize, however, that out-of-state producers are exempt from the over-order premium and that what is in the glass ultimately comes from Pennsylvania milk producers (via the inclusion of the over-order premium in minimum wholesale prices).  While milk dealers may choose for accounting purposes to allocate retained profits generated by Pennsylvania's system of minimum pricing to purchases of out-of-state milk, the fact remains that such profits under both the old and new over-order formula are generated through Pennsylvania producers.  Defendants do not contend that the effective over-order premium rate for some milk dealers won't go up.  However, this is not a case of Pennsylvania stealing from Ohio to pay Paul.  The Board is not imposing an increased charge on Pennsylvania milk dealers as plaintiffs would like the Court to believe.  Rather, the Board's new over-order formula adjusts for the fact that some Pennsylvania milk producers have not been paid as part of the Board-mandated minimum producer price their full portion of the over-order premium under the present system.

(*Id.*, p. 17 n.9).

The defendants second argument is that the new formula does not violate the Commerce Clause because it encourages the purchase of out-of-state milk. The defendants admit the new formula now makes Pennsylvania milk more expensive for dealers who buy some milk from out-of-state. It thus gives them an incentive to purchase out-of-state milk so that when their Pennsylvania purchases are below their Pennsylvania sales, they pay the over-order premium only on their Pennsylvania sales. "Moreover, once a milk dealer's Pennsylvania Class I [sales are] greater than its purchases of Pennsylvania raw milk (by substituting out-of-state milk), it will benefit by being able to retain the entire over-order premium on Pennsylvania sales attributable to out-of-state producer milk." (*Id.*, p. 19 n. 11). The defendants argue that, consequently, out-of-state producers will be able to command a higher price, not a lower one, as demand for their milk goes up.

The defendants find support for the latter argument in the testimony of Rutter and Chrastina at the Board hearing on whether to adopt the new formula. They both testified that one response to the new formula would be to increase their purchases of out-of-state milk. Rutter testified that he would, among other things, "go on a mission to sign up as many out-of-state producers" as he could (doc. 24-6, CM/ECF p. 72), and even create a Maryland distribution company. (*Id.*).[5] Chrastina said he believed Dean Sharpsville would be able to develop a largely out-of-state milk supply. (Doc. 24-7,

---

[5] He also said he would try to lower the price he paid to out-of-state producers. (*Id.*, CM/ECF p.71).

11

CM/ECF p. 16). Carl Herbein, an expert for the PAMD at the hearing, testified that "it is entirely possible that this formula change could make Pennsylvania producer milk much less attractive to" Pennsylvania dealers. (Doc. 24-5, CM/ECF p. 29). Finally, the defendants point out that the plaintiffs witness, William Schiek, affirmed that out-of-state milk would still command a competitive price (apparently because he affirms that there is little excess milk capacity).

We conclude that the plaintiffs have shown a likelihood of success on the merits. We start with the defendants' incorrect assertion in footnote nine of their opposition brief that the over-order premium is entirely a product of Pennsylvania producers' supply of milk. The new formula calculates the over-order premium on purchases of out-of-state milk, as well as on Pennsylvania milk and, significantly, pays the premium solely to Pennsylvania producers. No out-of-state producer benefits from the premium. This appears to conflict with *West Lynn Creamery*, where the Supreme Court struck down a Massachusetts pricing order that required dealers to pay a premium into an equalization fund on all fluid milk sold to Massachusetts retailers. The fund was then disbursed only to Massachusetts producers. The Court stated:

> Massachusetts' pricing order is clearly unconstitutional. Its avowed purpose and its undisputed effect are to enable higher cost Massachusetts dairy farmers to compete with lower cost dairy farmers in other States. The "premium payments" are effectively a tax which makes milk produced out of State more expensive. Although the tax also applies to milk produced in Massachusetts, its effect on Massachusetts producers is entirely (indeed more than) offset by the subsidy provided exclusively to Massachusetts dairy farmers. Like an ordinary tariff, the tax is thus effectively imposed only on

12

> out-of-state products. The pricing order thus allows
> Massachusetts dairy farmers who produce at higher cost to
> sell at or below the price charged by lower cost out-of-state
> producers.

*Id.* at 195-96, 114 S.Ct. at 2212. Here, the over-order premium is imposed on out-of-state milk sold as part of the dealer's Pennsylvania wholesale sales of Class I finished milk but is given to Pennsylvania producers alone. This appears to be a burden placed on out-of-state milk to the benefit of Pennsylvania. See also *Hillside Dairy, Inc., supra,* 317 F. Supp. 2d 1194, 1198 (E.D. Cal. 2004)(California statute requiring California processors to pay a premium into an "equalization pool" based on their purchase of out-of-state milk which benefitted only California producers violated the Commerce Clause).

        The magnitude and scope of this discrimination has no bearing on whether it has occurred. *Associated Indus. v. Lohman*, 511 U.S. 641, 650-51, 114 S.Ct. 1815, 1822, 128 L.Ed.2d 639 (1994). *See also Oregon Waste Sys., Inc.*, *supra*, 511 U.S. at 100 n.4, 114 S.Ct. at 1350 n.4 ("the degree of a differential burden or charge on interstate commerce 'measures only the *extent* of the discrimination' and 'is of no relevance to the determination whether a State has discriminated against interstate commerce'")(quoted case omitted).

        As to the assertion that the new formula would cause dealers to expand purchases from out-of-state producers, new sources are not readily available. The new formula also appears to reduce the ability of dealers to pay for out-of-state milk, thereby adversely affecting out-of-state producers.

13

C. *Irreparable Injury*

We agree with the plaintiffs that irreparable injury is established here because monetary damages are unavailable. Monetary compensation is foreclosed against the defendants in their official capacities by the Eleventh Amendment, *see Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir. 1991), and we believe qualified immunity protects them in their individual capacities. See, e.g., *Montanez v. Thompson*, 603 F.3d 243, 249-50 (3d Cir. 2010). *See generally*, *Firetree, LTD v. Creedon*, No. 08-245, 2008 WL 2078152, at *14-15 (M.D. Pa. May 15, 2008).

D. *Harm to the Non-moving Party and the Public Interest*

We believe that both of these factors favor the plaintiffs. As for harm to others,[6] the plaintiffs argue that neither the Board, nor its members, nor Pennsylvania producers will suffer harm as the effect of the injunction will simply be to maintain the status quo until an adjudication on the merits, with the producers at this time having only an expectation of increased revenue from the new formula. In opposition, the defendants argue that the financial interest of Pennsylvania producers (i.e. dairy farmers) counsels against an injunction because for many years they failed to receive their rightful share of the over-order premium and this practice should not be allowed to continue. We conclude this factor favors the plaintiffs because we cannot accept the defendants' position in light of the apparent fact that Class I milk sales do include out-of-state milk.

---

[6] Harm to others (as well as the parties) may be considered as part of the harm factor. *See Firetree, LTD*, *supra*, 2008 WL 2078152, at *15.

14

As to the public interest, the plaintiffs argue, and the defendants correctly concede, that if the plaintiffs have shown a likelihood of success on the merits and irreparable injury, the balance tips in their favor. *Miller v. Skumanick*, 605 F. Supp. 2d 634, 647 (M.D. Pa. 2009), *aff'd*, *Miller v. Mitchell*, *supra*, 598 F.3d 139, 147 (noting agreement with the district court's analysis of the public interest factor). Further, we deal here with a possible violation of a constitutional right. *Id.* This factor thus favors the plaintiffs.

We will issue an appropriate order.

       /s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: September 16, 2010

15

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FAIR OAKS FARM, a family partnership, :
owned and operated by
Mr. and Mrs. Lee Worthington; :
GAYLORD MILLARD, d/b/a Millard Dairy,
THE PENNSYLVANIA ASSOCIATION :
OF MILK DEALERS,
    Plaintiffs :

                            :
    vs.                             CIVIL NO. 1:CV-10-1591
                            :

RICHARD KRIEGEL, Chairman of the :
PA Milk Marketing Board;
LUKE BRUBAKER, and
BARBARA GRUMBINE, Members of the :
PA Milk Marketing Board;
    Defendants :

## *O R D E R*

AND NOW, this 16th day of September, 2010, it is ordered that:

  1. The plaintiffs' (doc. 6) motion for a preliminary injunction is granted.

  2. The defendants are hereby enjoined from enforcing Order A-968 until a trial on the merits resolves the Commerce Clause issue.

                            /s/William W. Caldwell
                            William W. Caldwell
                            United States District Judge